Commonwealth *v.* Webb et al., Appellants.

Submitted September 29, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*John R. Cook* and *John J. Dean,* Assistant Public Defenders, and *George H. Ross,* Public Defender, for appellants.

*Carol Mary Los and Peter Foster,* Assistant District Attorneys, and *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, November 17, 1972:

Following a joint trial, the appellants, Eugene Webb and Walter Webb, were convicted by a jury in Allegheny County of murder in the second degree. These appeals from the judgments of sentence imposed in the trial court[1] primarily raise the question whether the trial evidence was sufficient, as a matter of law, to establish beyond a reasonable doubt that an assault committed by the appellants on the victim was the cause of the latter's death. The circumstances presented are rather bizarre; nonetheless, after a careful review of the record, we are satisfied the evidence was sufficient to render the issue of causal connection a jury question.

Read in the light most favorable to the Commonwealth, the record discloses the following:

About 2:45 a.m., on February 6, 1971, the victim, Willie McCall, became involved in a verbal argument with one of the appellants, Eugene Webb, in the Na-

---

[1] Walter Webb was sentenced to imprisonment for a term of 2 to 10 years, and Eugene Webb was sentenced to imprisonment for a term of 3 to 10 years.

tional Alliance Postal Federal Employees' Club in Pittsburgh. Words led to a physical altercation and Walter Webb, the other appellant and a brother of Eugene, plus a third unidentified male joined Eugene in assaulting McCall. One witness described it as "a one-way fight".

The Webbs punched McCall repeatedly in the head with their fists. Walter also hit him in the face with an orange juice bottle while Eugene hit him with a piece of metal rail which he wrenched from the bar. McCall was knocked to the floor and as he lay helpless thereon face down, the Webbs continued to punch and kick him. Finally, one of the brothers kicked McCall over on his back and as he lay motionless in this position hit him in the face with a bar stool. The other brother concluded the attack by hitting McCall in the face with a water pitcher. A club attendant who attempted to stop the fight was also punched and beaten by the Webbs.[2]

McCall eventually rose to his feet on his own power and staggered to the outside. He was bleeding profusely from the head and face. One witness said the blood "ran like water" and another stated McCall looked similar to a pig that had been "butchered". After reaching the outside, McCall asked a Mason Stubbs "to please take him to a hospital". Stubbs enlisted the aid of a George Toliver whose automobile was parked nearby and McCall entered this vehicle and sat silently slumped down in the front passenger's seat. Enroute to the hospital, the automobile ran into a bump on the roadway, skidded and went out of control. The right side of the vehicle hit a steel utility pole on the side of

---

[2] The appellants were very quickly taken into police custody a short distance from the club. Upon being returned to the crime site, and informed McCall might be dead, Eugene Webb said: "I don't care if he is dead or not, if he is not, I'd like to get my hands on him and kill him."

the highway with great force and sustained extensive damage. When the police arrived on the scene minutes after the accident, McCall's head was on the curbstone with his legs extending into the vehicle through an open door, and with one leg pinned under the dashboard. An examination indicated McCall had no pulse.[3]

Dr. Joseph Sieracki, a pathologist of extensive experience who performed an autopsy about noon of the same day, testified to finding many injuries on McCall's body which he grouped into three major categories: (1) injuries to the head; (2) injuries to the chest; and (3) injuries to the extremities. The injuries to the head included a depressed skull fracture or a break in the bone of the skull over a four or five-inch area with the bone pushed into the brain substance. Six or seven ounces of blood filled the brain cavity to capacity. In the chest area "most of the ribs were broken in the front" and there were two "small lacerations or cuts in the heart." "Some blood-tinged fluid" was found in the chest cavity. There were also flesh wounds on the extremities and a flesh wound about a foot long extending upwards from the anus.

Dr. Sieracki then said it was his conclusion that the head injuries, specifically, the "cradiocerebral injuries" caused McCall's death and "there was no other way to conclude except that the head injuries came first and were fatal in nature." He went on to explain that if the injuries to the chest and the wounds to the heart had come first, the heart would have stopped and blood would no longer be "permeating through the body" and there would not be such a large amount of blood in the brain cavity. He also said the absence of any significant degree of hemorrhaging in the injured

---

[3] The record is silent as to what happened to McCall's body following the automobile accident or when he was officially declared dead.

rib area or in the area of the "gigantic" flesh wound above the anus fortified his conclusion that the death was due to the skull fracture, and that this injury antedated the injuries to the chest and heart.

Subsequently, the following two questions and answers ensued: "Q. Doctor, can you testify to this Jury, beyond a reasonable doubt that the cause of death of Willie McCall was craniocerebral injuries, including multiple fractures and maceration of the brain, which preceded the chest wounds, heart wounds or other wounds that you have described through your testimony? A. On the basis of my experience, I think I can testify beyond a reasonable doubt that the only explanation that I can offer for the primary cause of death being the head injuries or cradiocerebral injuries, that these occurred prior to the changes that have been described, the flesh wounds and the chest wound. Q. Can you testify beyond a reasonable doubt that at the time that the body of Willie McCall received the impact that caused a crushed chest, the lacerated heart and lacerated scrotal area, that he was dead? A. With a reasonable degree of certainty and beyond any doubt, that I can find from my experience."

In answer to a further question, the witness responded by saying ". . . we are led only to one possible reasonable approach and that is that the depressed skull fracture and the brain damage occurred prior to this impact [the automobile collision]."

It is unquestionably correct that one may not be convicted of murder unless the Commonwealth establishes every essential element of the crime beyond a reasonable doubt: *Commonwealth v. Radford*, 428 Pa. 279, 236 A. 2d 802 (1968). And, one such required element is the causal connection between the death and the criminal act: *Commonwealth v. Embry*, 441 Pa. 183, 272 A. 2d 178 (1971). Relying on *Embry*, the appellants contend Dr. Sieracki's testimony was insufficient,

as a matter of law, to establish the required causal connection instantly.

In *Embry*, a seventy-one-year-old woman was set upon and robbed of her purse by three youths. Upon her arrival at a hospital, she was pronounced dead. The pathologist who performed an autopsy found death was due to a myocardial infarction, commonly called a "heart attack". The felons were charged with murder, and at trial the pathologist testified on direct examination, that, despite the existence of a past history of cardiac-related problems on the part of the victim, he concluded "with a reasonable degree of medical certainty" that the emotional stress occasioned by the purse snatching and ensuing struggle caused the heart attack. However, on cross-examination, the witness said that while he was certain the heart attack caused the death, he was not convinced beyond a reasonable doubt that the purse snatching and the ensuing struggle produced the stress which, in turn, could have caused the heart attack. We ruled this testimony, in itself, was legally insufficient to establish the required causal connection beyond a reasonable doubt.

*Embry* is not the present case. Therein, the testimony of the medical witness was fraught with doubt. Although, he did on direct examination express the conclusion "with a reasonable degree of medical certainty" that the stress occasioned by the purse snatching and the ensuing struggle caused the heart attack, on cross-examination he admitted that because of the victim's past medical history, there was a reasonable doubt as to what caused the heart attack. Herein, the medical witness showed on the basis of the autopsy findings, there was an unbroken chain between the head injuries and McCall's death. Moreover, he was able to state this conclusion with a reasonable degree of medical certainty and beyond any reasonable doubt that he could find from his medical experience. This was suffi-

cient to meet the Commonwealth's burden of proof as to causal connection.

It was not necessary, as appellants contend, that the witness state it was his conclusion beyond a reasonable doubt the head injuries caused McCall's death. "Beyond a reasonable doubt" is a legal standard. Medical causation and legal causation are qualitatively different in their application. See 9 Duq. L. Rev. 542 (1971). Whether the Commonwealth's evidence is sufficient to warrant a finding of causal connection is initially a legal question for the court, but whether it is persuasive beyond a reasonable doubt is for the jury to say. In view of the testimony of the medical witness and that depicting the vicious assault on McCall by appellants, we cannot say, as a matter of law, that the jury improperly concluded the appellants caused McCall's death through violent means.

Finally, it is urged the verdict was against the weight of the evidence. This contention is intertwined with the primary contention that the Commonwealth's evidence was not adequate to establish the required causal connection beyond a reasonable doubt. While a pathologist called as a defense witness expressed the opinion based on his study of the autopsy report, certain exhibits offered at trial and some of the testimony in court, that "any or all of these skull injuries . . . could have occurred in the automobile accident," we are not persuaded this rendered the jury's verdict against the weight of the evidence. Under the circumstances, it was for the jury to resolve the conflicts in the testimony.

Judgments affirmed.